**Robert J. WATSON, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

**No. 90–1218.**

United States Court of Veterans Appeals.

March 2, 1993.

Robert J. Watson, pro se.

Robert E. Coy, Acting Gen. Counsel, Barry M. Tapp, Asst. Gen. Counsel, Andrew J. Mullen, Deputy Asst. Gen. Counsel, and Carolyn F. Washington were on the pleadings, for appellee.

Before HOLDAWAY, IVERS and STEINBERG, Associate Judges.

IVERS, Associate Judge, filed the opinion of the Court. HOLDAWAY, Associate Judge, filed an opinion concurring in result.

IVERS, Associate Judge:

Robert J. Watson appeals a July 9, 1990, Board of Veterans' Appeals (BVA or Board) decision which denied his previously disallowed claim for service connection for Buerger's disease on the grounds that the evidence submitted by appellant to reopen his claim, although new and material, did "not alter the basis upon which the prior decision was predicated." *Robert J. Watson*, BVA 90–22469, at 6 (July 9, 1990). The Court has jurisdiction of the case under 38 U.S.C.A. § 7252(a) (West 1991). The Court holds that, upon reopening, the BVA did not adequately "evaluate the merits of

the veteran's claim in light of *all* the evidence, both new and old." *Manio v. Derwinski*, 1 Vet.App. 140, 145 (1991). Accordingly, we vacate the decision of the BVA and remand the case for readjudication consistent with this opinion.

Furthermore, appellant filed a motion to submit, out of time, a counterdesignation of the record on appeal (ROA) consisting of a statement by Mr. William Schnarr; the Secretary of Veterans Affairs (Secretary), in response to a Court order to show cause why the document should not be submitted, did not oppose appellant's motion. The Court grants appellant's motion and the statement of Mr. Schnarr is considered as part of the ROA.

## FACTS

The veteran served in the United States Navy from November 1958 to August 1962. R. at 20. He made his first claim to the Veterans' Administration (now Department of Veterans Affairs) (VA) for service connection for Buerger's disease and Raynaud's disease in February 1980, stating that he believed the ailments began in the Navy and noting that he had received treatment after exposure to cold in 1958 at the Great Lakes Navy training center. R. at 33–34. Buerger's disease, also called thromboangiitis obliterans, is "thromboangiitis of the small arteries and veins of the extremities and esp[ecially] the feet resulting in occlusion, ischemia, and gangrene." WEBSTER'S MEDICAL DESK DICTIONARY 716 (1986) [hereinafter "WEBSTER'S"]. Raynaud's disease is "a vascular disorder marked by recurrent spasm of the capillaries and esp[ecially] those of the fingers and toes upon exposure to cold, characterized by pallor, cyanosis and redness in succession, usu[ally] accompanied by pain, and in severe cases progressing to local gangrene." WEBSTER'S at 604. The terms "Raynaud's phenomenon" or "Raynaud's syndrome" are used to describe "the symptoms associated with Raynaud's disease." *Id.*

The veteran's service medical records (SMRs) reflect that on December 22, 1958,

the veteran experienced "[d]izzy spells while on gate watch." R. at 9. The entry in the SMRs for that date also show that the veteran reported to sick call at 0800 hours and that he had eaten "no breakfast" and was suffering from "mild coryza" or a common cold. *Id.;* WEBSTER'S at 147. He was given medicine for his cold and assigned to light duty for twenty-four hours. R. at 9. In January 1959, the veteran was treated for common cold symptoms as well as vomiting. R. at 9–10. His discharge examination report, dated July 23, 1962, is unremarkable. R. at 18–20. In March 1980, a VA regional office (RO) rating board denied the veteran's claim for service connection for Buerger's disease and Raynaud's syndrome, noting that his SMRs were silent as to treatment or diagnosis of either and that the conditions were not noted upon an examination given by the VA in June 1966 pursuant to a claim by the veteran for service connection for other ailments. R. at 36.

In July 1981, the veteran made a claim for service connection for artery problems which had resulted in the amputation of his right leg. R. at 38. The RO rating board considered this a claim for service connection for peripheral vascular disease and denied it, stating that the evidence submitted failed to show that the disease was incurred in service or within one year after separation from service. R. at 79. The veteran appealed this decision to the BVA, which denied the claim on December 9, 1982. R. at 103–07.

In November 1984, the veteran attempted to reopen his claim for service connection for Buerger's disease and Raynaud's syndrome. R. at 109. On December 20, 1984, the RO rating board denied his reopened claim, stating, "Statements from the veteran [were] considered along with private hospital and physician's reports, but no change is warranted in the prior denial." R. at 126. The veteran did not appeal this decision.

On January 29, 1987, the RO received a letter with enclosures from the veteran's representative, asserting that medical documentation (including treatises), SMRs, a transcript from an RO hearing conducted in 1982, and present medical records showed that the veteran was entitled to service connection for Raynaud's disease. R. at 127. In addition, the RO received the veteran's rebuttal to the findings and conclusions in the BVA's December 9, 1982, decision. R. at 128–29. The veteran described, based on his own research of Raynaud's phenomenon, the symptoms and characteristics of the disease. He noted that the progression of the disease can be slowed by working in a warm environment and observed that, after exposure to the cold in boot camp, he had worked in warm environments while in the Navy, such as boiler rooms aboard ship. R. at 129. In the medical records submitted, the veteran circled diagnoses of Buerger's and Raynaud's diseases rendered in the early 1980's. R. at 130–33. In addition, the veteran submitted a letter, dated October 22, 1986, addressed to him from Mr. William Schnarr, the veteran's boss from 1962–1964. R. at 145. During this period immediately following the veteran's separation from the Navy, he worked as a sheetmetal apprentice. R. at 144. Mr. Schnarr stated,

It is well over 20 years since we worked together, but I can recall it. I was the mechanic in charge of the work we had [to] perform. And you was [sic] the helper or apprentice.... I was amays [sic] how your hand turn[ed] white, [and] you did tell me they hurt you very much[,] and that [you] put them in warm water in the [men's] room. I don't recall the year, but it was around 1962–1964. I can say that in the winter month[s], the ... sheets are very cold. It is like handl[ing] ice.... I know it must have been tough on your fingers. You did tell me that it all star[t]ed when you were in the [N]avy.

R. at 145.

The veteran also submitted a letter dated November 4, 1986, from Dr. Thomas L. Zoeller, which stated in part,

I have read and examined the condensed medical history which you have provided as well as the selected textbook chapter reprints and articles which you have provided. You have asked me to provide

you with a statement *"to establish a range of probability (distinguish from speculation)* proving my disease was present during service time or was present during service and/or was aggravated by [peacetime] service 1958 to 1962."

. . . .

I have always understood your working diagnosis as a patient within the VA system to be Thromboangiitis Obliterans (Buerger's Disease). This may in fact manifest itself initially with episodes of Raynaud's Phenomenon.

. . . .

*If in fact you are asking me to predict whether your disease process was directly related to or caused by your service activity (i.e. exposure to cold), I could only speculate.* The symptoms which you describe are consistent with cold hypersensitivity and Raynaud's Phenomenon, but I nowhere see described symptoms of cold injury which may have sequelae of vasospastic disorders.

I also know of no information which suggests that Buerger's Disease is secondary to cold injury.

R. at 146, 232 (emphasis added). The veteran also submitted a letter dated October 10, 1986, from Dr. John R. Parnell who stated, "Given the reported past medical history of this patient and the insidious course of both Buerger's and Raynaud's, *it is my opinion that there is a definite possibility that Robert Watson had Buerger's and/or Raynaud's in 1958 when he had his first indicated vascular type symptomatology."* R. at 147 (emphasis added). The veteran also submitted a weather report from December 1958, at Great Lakes, Illinois, which showed a maximum temperature of 42° and a minimum of 18° on December 22, 1958. R. at 149.

On February 4, 1987, the RO rating board denied the veteran's claim for service connection for Buerger's disease and Raynaud's syndrome based on the new and material evidence submitted by the veteran since the BVA's denial of the veteran's claim for service connection for peripheral vascular disease on December 9, 1982. R. at 222. In denying the claim, the rating board noted, "The current evidence submitted (including duplicate evidence of record) does not establish a diagnosis of Raynaud's Syndrome/Buerger's Disease or symptomatology thereof, in order to grant service connection in service or within the [one-]year presumptive period." *Id.*

On June 1, 1987, the RO received medical records from the VA Medical Center (VAMC), Gainesville, Florida, which covered a period of hospitalization from December 26, 1986, to January 6, 1987, during which time the veteran underwent a left above-knee amputation. R. at 224–25. On June 5, 1987, the RO rating board confirmed the previous denial of service connection for Buerger's disease and Raynaud's disease, stating that "h[ospital] r[ecord] shows treatment for claimed condition but is not new and material in that it does not serve to connect or relate to mil[itary] service or show manifestation during presumptive period." R. at 229.

On December 18, 1987, the RO received a copy of a letter dated December 8, 1987, addressed to the veteran from Dr. Justine L. Vaughen, Chief of Rehabilitation Medicine Service at the VAMC, Gainesville, stating in part,

Knowing that the predisposition to developing Buerger's disease may be a familial or congenital trait, it follows that you were vulnerable to this disease at the time of your service.

Knowing that the earliest symptoms began while you were still in service, it follows that you did in fact have this phenomenon while in service as the earliest symptoms of the Buerger's disease from which you are still suffering. *I believe that there is a connection between your symptoms in service and your medical condition (Buerger's disease) now.*

R. at 235 (emphasis added). On February 16, 1988, the RO received duplicates of the following: (1) the November 4, 1986, letter from Dr. Zoeller (R. at 232); (2) the October 10, 1986, letter from Dr. Parnell (R. at 233); and (3) the October 22, 1986, letter from Mr. Schnarr. R. at 234. Each of these letters had been received by the RO

previously on January 29, 1987. R. at 145–47. On February 22, 1988, the RO received from the veteran roughly forty-four pages of excerpts from various medical treatises on Buerger's disease, Raynaud's disease, and other related disorders. R. at 263–308. In addition, the veteran submitted copies of his SMRs. On February 24, 1988, the RO rating board confirmed the previous denial of the claim for service connection for Buerger's disease, noting in part,

> The only new document is [letter of December 8, 1987,] from Dr. Vaughen who states that vet[eran] may have been vulnerable during mil[itary] service and her opinion that vet[eran] had symptoms while in mil[itary] service and believes there is a connection. However, there is no medical evidence to support phys[ician's] opinion and statement is not new and material to reopen claim for s[ervice] c[onnection].

R. at 309.

On March 11, 1988, the RO received from the veteran's representative a duplicate copy of the December 8, 1987, letter from Dr. Justine Vaughen. R. at 310–11. On May 31, 1988, the RO received another copy of Dr. Vaughen's letter. R. at 312–14. On April 21, 1989, the RO received roughly 115 pages of materials from the veteran, including duplicates of the letters from Mr. Schnarr and Drs. Zoeller, Parnell, and Vaughen, duplicates of the veteran's SMRs and of the December 9, 1982, BVA decision, and excerpts from medical treatises. R. at 315–430. On April 25, 1989, the RO rating board again confirmed the previous denial of the claim, phrasing the issue as "[w]hether or not the various and sundry evidence submitted by the veteran ... constituted new and material evidence sufficient to reopen the previously denied claim for s[ervice] c[onnection] for Buerger's Disease" and noting, "Evidence is duplicating, cumulative in nature, and including the m[anu]s[cript] of [December 8, 1987,] offers no new and [material] factual basis for reopening the previously denied claim." R. at 430.

On May 10, 1989, the veteran filed a Notice of Disagreement with the April 25, 1989, denial of his claim. R. at 432. A Statement of the Case, dated June 1, 1989, was sent to the veteran (R. at 433–34), and the veteran perfected his appeal to the BVA by submitting a VA Form 1–9 on August 9, 1989. R. at 435–39. In denying the veteran's claim, the Board determined that "[e]vidence received subsequent to the December 1982 [BVA] decision, consisting of hearing testimony, lay statements, correspondence from VA and private doctors, and duplicate evidence previously considered by the Board, is new and material, but does not alter the basis upon which the prior decision was predicated." *Watson*, BVA 90–22469, at 6. The veteran perfected a timely appeal to this Court.

## ANALYSIS

"Except as provided in section 5108 of this title, when a claim is disallowed by the Board, the claim may not thereafter be reopened and allowed and a claim based upon the same factual basis may not be considered." 38 U.S.C.A. § 7104(b) (West 1991). Section 5108 provides: "If new and material evidence is presented or secured with respect to a claim which has been disallowed, the Secretary shall reopen the claim and review the former disposition of the claim." 38 U.S.C.A. § 5108 (West 1991). *See Manio*, 1 Vet.App. at 145 (1991); *Jones v. Derwinski*, 1 Vet.App. 210 (1991). In *Manio*, this Court held that

> the BVA must perform a two-step analysis when a veteran seeks to reopen a claim based upon new evidence. First, the BVA must determine whether the evidence is 'new and material'. 38 U.S.C. § [5108]. Second, if the BVA determines that the claimant has produced new and material evidence, the case is reopened and the BVA must evaluate the merits of the veteran's claim in light of *all* the evidence, both new and old.

*Manio*, 1 Vet.App. at 145.

In the instant case, the BVA correctly determined that the evidence submitted by the veteran since the December 9, 1982, BVA decision was new and material—specifically, the 1986 and 1987 letters from Drs. Parnell and Vaughen, respectively,

quoted above (R. at 147, 235). However, the Board's abbreviated discussion of the evidence does not "permit effective judicial review" (*Gilbert v. Derwinski*, 1 Vet.App. 49, 57 (1990) (quoting *International Longshoremen's Ass'n v. National Mediation Bd.*, 870 F.2d 733, 735 (D.C.Cir.1989)) as to whether the BVA "evaluated the merits of the veteran's claim in light of *all* the evidence, both new and old." *Manio*, 1 Vet. App. at 145. For example, the Board states,

> The evidence obtained in connection with the current reopened claim does not change the basic facts upon which the prior Board decision was predicated. The veteran is not shown to have Buerger's disease which originated in active service or for more than a decade after the veteran's service discharge. No new factual basis has been presented upon which to warrant a grant of service connection for Buerger's disease.

*Watson*, BVA 90–22469, at 5.

■ A determination of service connection requires a finding of the existence of a current disability and a determination of a relationship between that disability and an injury or disease incurred in service. *See* 38 U.S.C.A. § 1131 (West 1991); 38 C.F.R. § 3.303 (1992); *Rabideau v. Derwinski*, 2 Vet.App. 141, 143 (1992). That the veteran currently suffers from Buerger's disease is not in dispute in this case. *See Watson*, BVA 90–22469, at 5 (BVA refers to "the veteran's post[-]service reported Buerger's disease"). Thus, the veteran has attempted to establish the second point, i.e., the relationship between his current disability and an injury he claims to have suffered in service. To this end, the veteran has submitted evidence to reflect (1) the symptoms and causes of Buerger's and Raynaud's diseases, including the relationship between the two ailments and the relationship between Raynaud's disease and injury from, and sensitivity to, the cold (medical treatises and doctors' opinions); (2) that he suffered an injury in service from exposure to the cold and that thereafter, including during the year immediately following his discharge from service, he exhibited sensitivity to the cold (SMRs showing that he experienced "dizzy spells" on December 22, 1958, while on gate watch; reports of the temperature in Great Lakes, Illinois, on December 22, 1958; lay statements from his former wife, his brother, a Navy buddy, and his former boss, William Schnarr, who supervised the veteran during the year following his discharge from service; and the veteran's own sworn testimony); and (3) that his current disability is related to the cold injury he claims to have suffered in service (the opinions of Drs. Gilbertson, Zoeller, Parnell, and Vaughen).

■ The Court observes that the veteran has sought to lend coherence and credibility to his argument for service connection for his disorder by supporting his argument with the best evidence he can provide, evidence ranging from weather reports to lay statements to medical treatises to doctors' opinions. However, the Board, with its perfunctory discussion of the case, does not provide adequate reasons or bases for its evaluation and, here, rejection of the evidence offered by the veteran, as it is required to do (38 U.S.C.A. § 7104(d)(1) (West 1991); *Gilbert*, 1 Vet.App. at 56–57); nor does it inspire confidence that the evidence was considered in its entirety (in the context of *"all* the evidence" (*Manio*, 1 Vet.App. at 145)) or that relevant statutes and regulations were applied. As such, the BVA decision must be vacated and the case remanded for readjudication.

The Court observes in particular that the Board did not comment on the credibility or probative value of the lay evidence which the veteran submitted. However, the Court notes that, because Buerger's and Raynaud's diseases are considered "chronic diseases" under the law (38 U.S.C.A. § 1101(3) (West 1991); 38 C.F.R. § 3.309(a) (1992)), service connection may be granted to a veteran who suffers from them on a "presumptive" basis, i.e., the law "presumes" that these ailments had their onset in service if they manifest themselves to a certain extent within one year after discharge. *See* 38 U.S.C.A. §§ 1112(a), 1137 (West 1991). With regard to the evidentiary basis needed to establish "presumptive" service connection for a chronic disease,

regulation section 3.307 provides, "The factual basis may be established by medical evidence, *competent lay evidence* or both.... Lay evidence should describe the material and relevant facts as to the veteran's disability observed within such period, not merely conclusions based upon opinion." 38 C.F.R. § 3.307(b) (1992) (emphasis added); *see Cartwright v. Derwinski*, 2 Vet.App. 24, 25 (1992) ("Nowhere do VA regulations provide that a veteran must establish service connection through medical records alone."). Although the BVA listed this regulation in the LAW AND REGULATIONS section of its decision, the decision lacks an application of the regulation to the lay evidence of record, including the statement of Mr. Schnarr, the veteran's boss in the year following his discharge, who recalled that the veteran experienced sensitivity to the cold during that time. If the BVA concluded that the statement of Mr. Schnarr did not provide in itself or, even when considered in the context of all the other evidence of record, did not contribute sufficiently to the formation of a satisfactory evidentiary basis for service connection, the Board should have provided reasons or bases for its conclusion in this regard. *Gilbert*, 1 Vet.App. at 56–57.

In addition, with regard to the doctors' opinions about the relationship between the veteran's current disability and an injury during service, the BVA stated,

> The Board has taken cognizance of the opinions of the VA and private doctors relating the veteran's post[-]service reported Buerger's disease to his active service; however, the above opinions were expressed relative to a subjective history furnished by the veteran which has not been supported by medical records.

*Watson*, BVA 90–22469, at 5. Here, the sole reason for the Board's rejection of the doctors' opinions was that they "were expressed relative to a subjective history furnished by the veteran which has not been supported by medical records." The Board has offered nothing in support of this statement which would "identify those findings it deems crucial to its decision," nor does it "account for the evidence which

it finds persuasive or unpersuasive" (*Gilbert*, 1 Vet.App. at 57) as to the "subjective history furnished by the veteran" (*Watson*, BVA 90–22469, at 5) or as to those portions of the medical records which do not support or which contradict the veteran's history. The Board has supplied a "bare conclusory statement, without ... supporting analysis and explanation." *Gilbert*, 1 Vet. App. at 57. Such a statement is "neither helpful to the veteran, nor 'clear enough to permit effective judicial review,' nor in compliance with statutory requirements." *Id.* (quoting *International Longshoremen's Ass'n*, 870 F.2d at 735.) Simply stated, there must be more than a conclusory statement labelled by the BVA or by this Court as "reasons or bases" to satisfy the requirement set forth at 38 U.S.C.A. § 7104(d)(1). *See Gleicher v. Derwinski*, 2 Vet.App. 26, 28 (1991) (merely pointing to appellant's relatively advanced education and occupational experience and opining that his disabilities did not "preclude all forms of substantial gainful employment" was "insufficient" in providing "reasons and bases" for denying a total disability rating under 38 C.F.R. § 4.16); *Wood v. Derwinski*, 1 Vet.App. 190, 193 (1991) (if BVA fails to give "sufficient reasons or bases" for accepting or rejecting critical evidence, expert or otherwise, remand may be appropriate, but remand not required here because BVA opinion concerning the evidence was "both plausible and adequately explained"). The Court holds that the conclusory statement of the Board does not constitute an adequate statement of "reasons or bases" for the Board's rejection of the evidence in this case. 38 U.S.C.A. § 7104(d)(1); *see Gilbert*, 1 Vet.App. at 56–57, 59; *Colvin v. Derwinski*, 1 Vet.App. 171, 175 (1991).

Upon remand, the evidence in this case must be reexamined and reasons or bases provided as to the sufficiency or insufficiency of both individual items of evidence with regard to the proposition each is intended to support and the evidence in its entirety with regard to the ultimate decision granting or denying service connection. Medical evidence favoring the veter-

an's claim may not be refuted by the Board's "own unsubstantiated medical conclusions" (*Colvin*, 1 Vet.App. at 175), but must be weighed in light of other medical evidence. Moreover, the Board should consider the relationship, if any, between Raynaud's disease and Buerger's disease. Finally, the Court notes that "[a] remand ... is [not] merely for the purposes of rewriting the opinion so that it will superficially comply with the 'reasons or bases' requirement of [38 U.S.C.A. § 7104(d)(1) but rather] is meant to entail a critical examination of the justification for the decision." *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991).

## CONCLUSION

Accordingly, for the reasons noted above, the July 9, 1990, decision of the BVA is VACATED and the case REMANDED for readjudication consistent with this opinion.

HOLDAWAY, Associate Judge, concurring:

I concur in the result but disassociate myself from that part of the opinion that finds the BVA's reasons or bases "inadequate" in rejecting the opinions of the VA and private doctors. I would find the reasons given ("opinions were expressed relative to a subjective history furnished by the veteran which has not been supported by the medical records") do adequately explain why the Board reached the decision it did. These are plausible reasons for rejecting the doctors' opinions. In this effectively concise phrase, the Board gave two distinct reasons for its findings: that the opinions were solely based on the "subjective" (hence possibly biased) history from the claimant and that there was lack of corroboration from medical records that were contemporaneous with the alleged injury that had occurred two and one half decades ago. Alone or in combination these reasons would be more than sufficient to permit a common law jury to reject the opinions. (*See generally*, 98 C.J.S. § 458 et seq.) The statute, 38 U.S.C.A. § 7104(d)(1), requires *only* that "reasons or bases" be given, nothing more and nothing less. An individual unencumbered with a law degree would have no difficulty interpreting the plain and simple meaning of the three words "reasons or bases": Was a reason or basis given in the decision for the finding? The majority apparently concede that such reasons were given; they can hardly do otherwise. With all respect to my colleagues, the analysis finding the reasons inadequate is subjective, lacks substance, and is itself "wholly conclusory." They cavil solely at the "adequacy" of the reasons. But that quibble apart, in so doing, of course, they add a gloss to the statute; in a word, they judicially amend it. There is absolutely no qualitative requirement in § 7104(d)(1). Moreover, by acknowledging that reasons were given but finding them inadequate, they are, in effect, involving themselves in the fact-finding process. If inadequate reasons were given then surely the defect is in the fact-finding, not the writing of the decision. If that is so, then the judicial review should focus on the fact-finding and the appellate standards that apply thereto. In short, there is a subtle but very important difference between "adequate reasons or bases" (a term Congress could have used but didn't) and "reasons or bases that adequately explain the basis of the decision." I'm afraid this Court, myself included, has not always grasped this subtle distinction.